UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
UNITED STATES OF AMERICA,

    -against-                                     **MEMORANDUM AND ORDER**

NEZER PAPRANIKU, ET. AL.                      11-CR-345 (SLT)

                Defendants.
-----------------------------------------------------------------x

**TOWNES, United States District Judge:**

Defendant Nezer Papraniku (hereafter, "Defendant") was indicted by a Grand Jury for, *inter alia*, possession with intent to distribute a substance containing cocaine base. Before this court is Defendant's motion to suppress items recovered from his luggage in Defendant's sister's car and evidence obtained from a search of his car.

On March 22, 2013, this court conducted a suppression hearing on Defendant's motion. At the hearing, the government presented the testimony of New York City Police Sergeant Neil Clancy, Special Agent Frank Adamo, and Special Agent Al Gyenes. In addition, Defendant presented testimony from his sister, Pranvera Papraniku. Except where indicated, the facts recounted herein rely on the testimony elicited from the officers at the hearing.

## *FACTS*

*Search of Defendant's Sister's Vehicle*

Clancy testified that on January 16, 2012, he, along with several other agents, with arrest warrant in hand, was conducting surveillance of the house where Defendant resided. (Tr. at 15.)[1] At approximately 7:00 a.m., Defendant and his sister, Pranvera, entered a car and left the house. (Tr. at 16.) Clancy directed agents Scotto and Mercurio, and detectives Roman and Eugene to follow the car. (Id.) The agents followed the car to a service road by the Staten Island

---

[1] Numbers in parentheses denote pages in the transcript of the March 22, 2013, hearing.

Expressway and stopped the car. Clancy approached the driver's side of the vehicle while Scotto approached the passenger's side. (Id.) Clancy asked Defendant's sister for her license and registration and Scotto did the same for Defendant. (Tr. at 17.) Clancy asked Defendant's sister where they were going, and she replied that they were headed to the airport. (Id.) Clancy then asked Defendant's sister where any luggage was located because he initially thought Defendant might be trying to flee and he wanted to confirm that they were heading to the airport. (Tr. at 18, 39.) Defendant's sister stated that the bags were in the trunk. (Id. at 18.) Although the chronology is somewhat unclear, at some point, Scotto asked Defendant to get out of the car, indicated that he was under arrest, and walked to the back of the car with him. (Tr. at 18, 36.) Clancy also walked to the back of the car and the trunk was open. Clancy could not recall who opened the trunk. (Tr. at 41.) Clancy did, however, recall that he did not ask permission to open the trunk. (Tr. at 41-42.) Once the trunk was open, Defendant stated that the luggage inside belonged to him. (Tr. at 41.) There is no dispute that the luggage was closed. (Tr. at 10.) The officers then took the bags because, according to Clancy, they needed to conduct an inventory search. (Tr. at 18-19.)

Despite the facts presented in the government's opposition memorandum, Clancy testified unequivocally that neither Defendant nor his sister consented to any search or seizure of the luggage and that any search and seizure was not conducted incident to Defendant's arrest. (Tr. at 10, 25-26.) Although Clancy could not recall whether Defendant's sister stated that she would take the bags or whether she asked the officers to leave the bags in the trunk, Clancy testified that he would not have done so because he would have had to perform the inventory search on the street, which he stated was not practical. (Tr. at 44-45.) Defendant's sister testified to substantially these same facts. However, unlike Clancy, Defendant's sister recalled

2

that, after informing Clancy that the luggage was in the trunk, he directed her to open it. (Tr. at 95.) However, Defendant's sister indicated that at the time, the trunk was unlocked so that an individual needed only to push the button located directly under the trunk to open it. (Tr. at 97.) Before she complied with Clancy's order, she heard Scotto call from the back of the car, although she was unsure if he had said "Never mind, it's open," or "I got it." (Id.) Regardless, Defendant's sister testified that she did not open the trunk and that, once it had been opened, the officers simply took the luggage. (Id.) The officers arrested only Defendant. His sister was permitted to drive away in the car.

Upon seizing the luggage, Scotto transported the bags back to the New York Field Office and conducted an inventory search of the bags. (Tr. at 11.) The search yielded, among other things, approximately $20,000 and a UPS tracking slip. (Tr. at 24.) Following Defendant's arrest, Agent Adamo, who was the case agent assigned to Defendant's case, but who was not present for the January 16 arrest, was informed that as a result of the inventory search, the officers had recovered a sum of cash and a suspicious receipt. (Tr. at 51.) Adamo received Defendant's remaining property, including the luggage and its contents other than the cash and receipt, some clothing, and some other items. Adamo, as case agent, visually inventoried the items, ensuring that there were no dangerous or illegal items, as well as no high value items. (Tr. at 52.) Adamo then secured the items by locking them in a file cabinet. (Id.) The following day, after Defendant's initial appearance in federal court, Adamo offered to return Defendant's property which had not been retained as evidence to his attorney. (Tr. at 53.) Days later, Defendant's attorney contacted Adamo, they agreed to a date, and the property was returned. (Id.)

3

*Search of Defendant's Vehicle*

Agent Gyenes testified that on August 10, 2011, he and several other officers were conducting a search at the home of Defendant's cousin and co-defendant in this case, Afrim Kupa, when Defendant appeared at the front door to the house. (Tr. at 62.) Gyenes informed Defendant that he was not under arrest but instructed him that he was not free to leave until the officers had completed the search of the home. (Tr. at 64-65.) Defendant was also directed to sit on a couch in his cousin's home and was not free to get up or walk around. (Tr. at 64.) Gyenes explained to Defendant that once the search was completed, they would all leave the house together. (Tr. at 65.) Gyenes estimated that, although "it's hard to say," Defendant remained in the house for approximately twenty minutes. (Tr. at 70.)

Following the search, Defendant's cousin was arrested as well as several other individuals and the officers, arrestees, and Defendant all exited the house together. (Tr. at 66.) Gyenes testified that both during the search and once outside of the house, Defendant was agitated and disrespectful to the officers. (Tr. at 65, 67, 74.) Although the precise chronology of events is again somewhat unclear, once outside the house, Gyenes informed Defendant that he "was looking to arrest him in the future because [Gyenes] knew he was part of [his cousin's] organization." (Tr. at 74.) Moreover, at some point following Gyenes's statement to Defendant, Gyenes's fellow officer, Detective Quinones, asked Defendant how he arrived at his cousin's house. Defendant informed Gyenes and Quinones that he had driven there and that his car was parked on the street. Quinones then asked Defendant if he and Gyenes could search Defendant's car. Gyenes stated that Defendant consented and turned his keys over to Quinones. (Tr. at 66-67.) Gyenes testified that only he and Quinones heard Defendant consent to the search and

4

stated that neither asked Defendant to sign a consent form, because they believed his oral consent was sufficient. (Tr. at 67, 85.) The search yielded a stack of money. (Tr. at 67.) Following the search of Defendant's car, Adamo, who was not present for the search, prepared a report. (Tr. at 79, 86.)

## *DISCUSSION*

A defendant seeking to suppress evidence seized during a warrantless search bears the burden of showing that he had a reasonable expectation of privacy in the place or object searched. *California v. Greenwood*, 486 U.S. 35, 39 (1988). If the defendant makes such a showing, then the burden shifts to the government to show that the search fell within one of the exceptions to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993). Evidence supporting the denial of a motion to suppress must be viewed in the light most favorable to the government. *United States v. Casado*, 303 F.3d 440, 443 (2d Cir. 2002).

As an initial matter, the court finds unpersuasive the government's argument that Defendant lacked a reasonably expectation of privacy in his luggage. The test of whether an individual's expectation of privacy is legitimate is whether the individual has "exhibited an actual (subjective) expectation of privacy . . . that society is prepared to recognize as reasonable." *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring); *Perea*, 986 F.2d at 639 (citations omitted). And while it might well be true that "[p]assengers, no less than drivers, possess a reduced expectation of privacy with regard to the property that they transport in cars," *Wyoming v. Houghton*, 526 U.S. 295, 303 (1999), the Second Circuit has indicated that "passengers may nonetheless retain an actual, reasonable, socially recognized expectation of privacy in their luggage, even when it is transported in a vehicle driven by or shared with

5

others." *United States v. Sparks*, 2008 WL 2872663, at *2-3 (2d Cir. 2008) (citing *Bond v. United States*, 529 U.S. 334, 338-39 (2000)). Indeed, here, Defendant's sister offered uncontroverted testimony that Defendant had both the authority to exclude others from her car and to say that an individual did not have the right to search the trunk. (Tr. at 96.) Accordingly, the court finds that Defendant had a legitimate expectation of privacy in the vehicle. *Cf. United States v. Bulluck*, 2010 WL , at *14 (S.D.N.Y. May 13, 2010) (noting that "typically, a passenger in an automobile does not have a right to expect privacy as he *has no right to exclude others from the car.*") (emphasis added); *see also id.* (citing *United States v. Santiago*, 950 F. Supp. 590 (S.D.N.Y. 1996)) (noting that taxi passengers enjoy a reasonable expectation of privacy in the back seat area of a taxicab because "their hiring of the vehicle gives them a possessory interest in the passenger area for the duration of their trip.").

Nonetheless, the government can legitimate the warrantless search of Defendant's luggage by showing that it was made pursuant to a valid exception to the general proposition that law enforcement may conduct searches only pursuant to a valid warrant. Although not specifically addressed by either party, the court notes that the automobile exception does not apply here. Under that exception, "police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." *United States v. Howard*, 489 F.3d 484, 492 (2d Cir. 2007) (internal quotation marks omitted). The court notes, however, that there is no evidence in the record and no testimony elicited at the hearing to indicate that the police officers had probable cause to believe Defendant's sister's vehicle – or for that matter, Defendant's luggage – contained any evidence of a crime. To the contrary, when Clancy was asked why he seized the luggage, he stated only because it belonged to Defendant. (Tr. at 44, 45.) Moreover, to the extent the

government may argue that Defendant lacks standing to complain of the search of the automobile, Defendant has clearly evinced a legitimate basis for being in the car given his sister's testimony that he had the power to exclude people from the vehicle. *See United States v. Ponce*, 947 F.2d 646, 649 (2d Cir. 1991) ("To mount a challenge to a search of a vehicle, defendants must show, among other things, a legitimate basis for being in it, such as permission from the owner.") (citation omitted).

The Supreme Court has held that an additional exception to the warrant requirement allows law enforcement to conduct an "inventory" of the contents of a car when they validly impound the vehicle. Such searches are constitutional under the Fourth Amendment because they "serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Colorado v. Bertine*, 479 U.S. 367, 372 (1987). Today, "the inventory search constitutes a well-defined exception to the warrant requirement." *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983).

Of course, "the right to [make an] inventory . . . does not carry in its wake unlimited discretion." *United States v. Griffiths*, 47 F.3d 74, 78 (2d Cir. 1995). Under the inventory search doctrine, the Second Circuit has held that "law enforcement officials may open closed containers as part of an inventory search so long as they act in good faith pursuant to 'standardized criteria . . . or established routine.'" *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994) (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990). "The existence of such a valid procedure may be proven by reference to either written rules and regulations or testimony regarding standard practices." *Id.* (citations omitted).

A valid inventory search routine may allow the searching officers "sufficient latitude to determine whether a particular container should or should not be opened," *Wells*, 495 U.S. at 4,

7

but "[t]he individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime.'" *Id.* (quoting *Bertine*, 479 U.S. at 376 (Blackmun, J., concurring)). In short, "[t]he policy or practice governing inventory searches should be designed to produce an inventory." *Id.*

Here, the government relies heavily on the DEA policy governing inventory searches. The sole consideration mentioned in the policy states that "[i]nventory searches are made to identify items of value in order to protect DEA personnel from claims of theft or loss of property that enters DEA custody." (Gov't Ex. GX-2.) The policy includes a provision allowing DEA personnel to conduct inventory searches of "all containers, whether locked or unlocked, that are lawfully seized for safekeeping." (Id.) The policy, however, is silent on how DEA personnel are instructed to act when there is an individual present who can take control of the property. Indeed, it is unclear to the court how the concerns addressed by the policy – the fear that DEA personnel will be subject to claims of theft or loss -- are implicated in cases such as this when there has been demonstrated no right to search the vehicle or for law enforcement to seize the property at all. Thus, given the DEA's policy's stated aim of protecting DEA personnel from claims of theft or loss, the court finds that it does not apply to circumstances where, as here, law enforcement is not lawfully in possession of the property.

In this regard, the court finds instructive the reasoning employed by the district court in *United States v. Goodrich*, 183 F. Supp. 2d 135, 140-41 (D. Mass. 2001) -- the only case, as far as the court is aware, where the police decided to conduct an inventory search despite the presence of an individual who could take possession of the property. In *Goodrich*, the defendant was arrested pursuant to outstanding arrest warrants. The police had followed defendant to a parking lot adjacent to a building where the police knew defendant's wife worked. The

defendant legally parked the car and entered the building. The defendant was subsequently arrested inside the building. At the evidentiary hearing, the police officer testified that while defendant was being arrested, his wife provided him with the keys to the car. He subsequently performed an "inventory search" of the car that revealed a closed duffel bag inside the unlocked trunk. Although the officers had initially directed the defendant's wife to stay inside the building during the search, at some point, she was called out to the parking lot and informed that the car would be towed. The officers removed the duffel bag and waited for the tow truck to arrive. The police entrusted the defendant's wife to inform her sister-in-law, the car's registered owner, that the vehicle had been impounded. *Id.* at 137-38. After the car had been towed, the officers opened the duffel bag and found a handgun.

The district court, in concluding that the inventory search was impermissible, found immaterial that the duffel bag was located in a vehicle that did not belong to the defendant. Rather, the court concluded that the search was improper because there was no non-investigatory need for the police to impound the defendant's car and subsequently search its contents given that the "car was parked in a legal parking space in the lot owned by his wife's employer . . . [and the police] could simply have permitted [the defendant's] wife, who was entrusted with the keys by [the defendant] – and by the police with delivering property of the car's owner, her sister-in-law – to take immediate responsibility." *Id.* at 143. Although the officers here did not impound Defendant's sister's car, their search of the car was equally impermissible. It is undisputed that Defendant's sister owned the vehicle, was driving the vehicle and present at Defendant's arrest, was not placed under arrest herself, and was entrusted by the police to drive the vehicle away. Accordingly, as the court finds that the police "undertook the decision to search the car by an understandable but unconstitutionally satisfied desire to obtain evidence," it

concludes that the inventory search was merely a pretext for a warrantless investigative initiative in violation of the Fourth Amendment. *See id.* at 144.

The court also notes that the cases relied on by the government offer little elucidation. The Second Circuit has noted that law enforcement individuals frequently conduct inventory searches "when the police impound vehicles or detain suspects." *United States v. Mendez*, 315 F.3d 132, 137 (2d Cir. 2002). However, none of the cases relied on by the government in its opposition to Defendant's motion to suppress present an analogous situation to that here; rather, the cases all involve situations where the defendant or defendants arrested were the sole individuals present to take control of the property at issue, thereby creating a non-investigatory need to conduct an inventory search. *See Bertine*, 479 U.S. at 368 (driver was arrested and inventory search conducted of the impounded van); *Lafayette*, 462 U.S. at 648 (noting that individual was arrested carrying a shoulder-bag and holding that it was "not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article *in his possession*, in accordance with established inventory procedures.") (emphasis added); *United States v. Lopez*, 547 F.3d 364, 369 (2d Cir. 2008) (both individuals arrested and inventory search performed after police officer took control of the car and drove it to the station); *Thompson*, 29 F.3d at 64 (driver was arrested and inventory search conducted of impounded vehicle). Under the circumstances described, Defendant's motion to suppress the evidence obtained during the search of his sister's car is granted.

*Search of Defendant's Vehicle*

The government has the burden of proving that an individual's consent to a search was voluntarily given by a preponderance of the evidence, *see United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983) (citing *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) in

light of "the totality of the surrounding circumstances." *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). The court finds that the government has not met its burden here.

As described, Gyenes testified that Defendant showed up at the front door to his cousin's house where law enforcement was conducting a search. Although it is unclear from Gyenes's testimony how this occurred, Defendant ended up inside the house. Defendant was informed that although he was not under arrest at that time, he was not permitted to leave the house, get up off of the couch, or walk around. Defendant was subjected to these restrictions *for at least* twenty minutes.[1] (Tr. at 70.) Gyenes described Defendant's demeanor as agitated and disrespectful. (Tr. at 65, 67, 74.) Defendant then watched as his cousin was led out of the house under arrest.

Once outside the house, Gyenes and his fellow police officer, Quinones, continued to speak with Defendant. At some point, Gyenes indicated to Defendant that he believed he was involved in his cousin's organization and that Defendant would likely be arrested in the future. (Tr. at 74.) Following this statement, Quinones asked Defendant how he had arrived at the house. Defendant eventually stated that he had driven and that his car was parked down the street. (Tr. at 66-67.) At this point, Quinones asked Defendant for permission to search his car, and, according to Gyenes, Defendant simply said yes and handed the police officers the keys to his vehicle. Given that Defendant was detained against his will for twenty minutes and observed his cousin being arrested, in addition to the fact that his permission appears to have come on the heels of Gyenes's threat that he would likely soon be arrested as well, the court finds that the government has failed to in its burden to prove that any consent Defendant provided was "the

---

[1] Although not received into evidence, the court notes that Gyenes testified that the only report of the incident, which was prepared by an officer who was not present for any part of the events in question, indicated that Defendant was not permitted to leave the house for closer to two hours and that Defendant's cousin was actually arrested prior to the police conducting a search of the house. Gyenes, however, testified that he believes the information contained in the report is incorrect. (Tr. at 90.) In any event, for purposes of deciding the current motion, the court credits Gyenes's version of events.

11

product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

## CONCLUSION

For the reasons set forth above, Defendant's motion to suppress the items recovered from both his sister's car and his own car on Fourth Amendment grounds is granted.

**SO ORDERED.**

                                                                            /S/
                                                           SANDRA L. TOWNES
                                                           United States District Judge

Dated: March 29, 2013
       Brooklyn, New York